20-5204 et al. Consolidated Tribes of the Chehalis Reservation et al. Yuti Tribe of the Yuinta and Goree Indian Reservation. 20-3077-C Appellant v. Steven T. Mnuchin in his official capacity as Secretary of the U.S. Department of the Treasury et al. Mr. Kanji for the appellants. Mr. Rasmussen for the appellants. Mr. Jed for the appellees. Mr. Clement for the interviews. Mr. Kanji. Thank you, Judge Henderson, and may it please the Court, I would like to make three points. Before you begin, let me just say the three of us have caucused. You have just a short time to argue. Could you refer to this Indian Self-Determination and Education Assistance Act as ISDEA? Yes, Your Honor, I will do that. Thank you, and may it please the Court, I would like to make three points about the Indian tribe issue. First, under a natural reading of the Indian tribe definition, the eligibility clause squarely applies to the Native corporations. Second, the legislative history and the rule against surplusage cannot and do not undermine that natural reading. And third, there is no uniform countertextual agency interpretation that Congress could have been aware of, let alone sought to ratify in enacting the CARES Act, and adhering to the statutory text will not upend decades of agency practice. Turning first to the text, which is worthy analysis. Before we get into Kanji, can I ask you just a quick procedural question? My understanding is that the district court's stay in this case expires on September 15th, unless there's a subsequent motion. Have you all moved to have that extended until the end of the month or our decision or something like that, or is it not expiring? We have not so moved yet, Your Honor. We thought we would wait until after these proceedings. The district court did appear to leave it open to this court to continue to stay, if it so desired, so we thought we would sort of take the lead of this court. If there is an indication that we should move the district court, we will certainly do so and obviously do so expeditiously. Okay, thank you. Turning first to the text, which I think is where the analysis should begin and end, the Indian tribe definition consists of a series of parallel nouns with three, the villages and the two sets of corporations listed as an illustrative subset. The ANCs would have you stop there, but that would be a failure to read on. Immediately following the ANCs comes the eligibility clause. In ordinary English, that clause would be understood to modify all the parallel nouns, the entities that come before it. The other option, if sufficient textual clues existed, would be for it to modify only the immediate antecedent, which would still sweep in the ANCs. The government, however... No doubt you're right about that as a matter of grammar, but suppose it were perfectly clear at the time ISTA was enacted that no ANC could ever be recognized as an Indian tribe. Would you still take the position that the ordering of nouns prevails over what, in my hypothetical anyway, would be a completely inexplicable insertion of ANCs into this list of nouns? Your Honor, Judge Katz is accepting the premise for a minute, which of course we don't, but accepting the premise, yes. I think Congress's English would still apply and would still be worthy of being honored, and I think it's worth noting a few things in this regard. Subsequent Congressional practice fully confirms this. Congress uses the... Let's talk about text before we get to ratification. I mean, that seems awfully odd. It's supposed to give effect to every part of a statute if we can, and that's a pretty striking insertion into the statute. It is its own clause, including any native village or regional corporation established by the ANCA. You would just read all of that right out. No, we certainly wouldn't read it out, Your Honor. I think as we understand the statutory phrasing, Congress allowed for the possibility that any of those entities might qualify as tribes, any of the listed entities, so long as they satisfied the eligibility clause as a historical. Which is surplusage or a fool's errand or whatever word you want to use if there's no possibility that the corporations could at the time maybe have been recognized as an Indian tribe. So first, I want to make sure I understand the premise. If the premise is that Congress understood at the time that ANCs could never satisfy the clause, that's a historical premise. And I want to make sure I understand whether the premise is static or dynamic. One thing about the eligibility phrasing is it allows for changes in status over time. So Congress, again, I'm just accepting the premise, may have understood at the time that ANCs didn't satisfy the clause,  understood that they could never satisfy the eligibility clause, whereas the phrasing allows for changes over time. And indeed, all those entities have had changes in status over time. As a historical fact, as we've said, Congress in 1975 would have had no reason to understand that ANCs absolutely could not satisfy the eligibility clause. It was a tremendous amount of historical flux at the time. I think the Chantinetti solicitor opinion underscores that. And another historical fact, Judge Katz, is that I think bears mention, a textual factor, is it would have been passing strange for Congress to single out ANCs as the only entities which were not subject to the eligibility clause because ANCSA itself provided, the original form of ANCSA provided, that within 20 years all restrictions on ANCSA stock would expire. Originally they were pledged to natives, but that restriction and alienation would have been totally lifted within 20 years. So under the government and the ANC view, the only entities that would not be subject to the dynamic force of the eligibility clause over time would be the very entities that 20 years hence may have become fully non-native controlled and owned corporations. Congress since, I should say, 1990, extended that restriction against alienation. But in 1975, under Section 7 of ANCSA, that was the state of affairs. So in terms of premises and historical understandings, for those to be the one entity in an Indian self-determination act that were not subject to the force of the eligibility clause in your terminology would have defied sense. I'd like to make another point, textual point, in response to your question, which is to look at the language of the CARES Act itself because there have been a lot of hypotheticals thrown around in the briefing, but Congress's actual words I think squarely confirm our position in the case. If one looks at the definition of a local unit of government, which follows immediately after the Indian tribe definition, this is on page 8, appendix 4 of our opening brief, Congress defined a unit of local government to mean a county, municipality, town, township, village, parish, borough, or other unit of general government with a population that exceeds 500,000 people. So we have a qualifying clause at the end. Let's just take parishes as one example. Parishes are the Louisiana equivalent of a county. They're defined as such under Louisiana law. We check there is no parish in Louisiana or in the country that has a population exceeding 500,000 people. In, I think, ordinary understanding, accepted principles of statutory interpretation, the result of that is that no parishes qualify for Title V funding. That's the force of the qualifying clause there. Under the ANC and government interpretation, all parishes should get Title V funding because by definition right now, none of them meet the eligibility qualification there. We think that that is not the way that statutory interpretation would normally proceed. Congress has made very clear there that, and I think this is a normal matter of statutory drafting, that it can draft a broad, expansive list of entities with the understanding that a qualifying clause at the end can then cabin the appropriate universe of eligible statutory participants. First of all, on the surplus-ish thing, I take it from your briefing and I just want to confirm that there's no dispute that within those two commas, the phrase Alaskan Native Village is subject to the eligibility clause? That is the government's position and it's certainly our position, Your Honor. Are there any Alaska Native Villages, I guess, with a little n, maybe, that have not been recognized? Let's say even in modern times, don't show up on a list back. Are there any that wouldn't meet the eligibility clause so that the eligibility clause has some work to do? Yes, Your Honor, there absolutely are. So the Santenetti and Solicitor General opinion lays this out well. ANCSA listed a universe of possible villages, but then there were eligibility fights that stretched into the late 1980s, and the Interior Department deemed, I think, at least 15 or 20 villages to be non-eligible. So that's, I think, part of the reason why the government understands that the eligibility clause has to apply to the villages. Otherwise, you would have entities qualifying for all manner of statutory benefits who, in fact, the government has deemed to be non-native villages. The problem with the government's position, of course, is that it makes grammatical hash out of the definition by saying that the eligibility clause applies to the, I'm sorry. No, no, I understand that argument in your brief. My other question, though, is I'm a little confused by the assortment of parties here. If you were to win, so the money that's now being held can't go, wouldn't go to ANCs, would it go to Alaska Native villages? Would it stay in Alaska through some form or another? Or would it get dispersed across the United States? So it's already sort of designated for Alaska, and it's targeted for ANCs right now. Yeah, if you can't answer that question, Your Honors, I don't know because Treasury's allocation formula is a black box to those of us on the outside. So we don't know how Treasury would end up allocating those monies. The plaintiffs here are an assortment of tribes in the lower 48 and Alaska Native villages. And the concern here I should underscore is not only the money, which is incredibly important for the governmental purposes for which it was intended, but also the principle here, the functioning not only of IZDIA, but of many statutes that have followed in its stead, because IZDIA was meant to buttress, support, foster tribal self-determination. And what it did, the principle mechanism for IZDIA was to say if an Indian tribe passes a resolution saying to the federal government, hey, we want now to administer programs that you in your paternalistic way used to administer, we either want to administer them ourselves or we want to designate a tribal organization to administer them, we're passing this resolution and directing you to do that. The tribes, the repository of decision-making, under the view that's been proffered here by the government and the ANCs, the ANCs could fill that role for all manner of contracting. They could say, hey, we want contracts to go X, Y, or Z. The role that ANCs have actually played. Let me back up here because you're stepping into an area where I have another question, and that is in the eligibility clause, unlike the List Act, it doesn't say recognized by the secretary. So could an Indian tribe be recognized by Congress under this statute? I'm sorry, Your Honor, under IZDIA? Under IZDIA, would that eligibility clause be satisfied if Congress passed a statute, like in the Frank's Landing Act case that said, we hereby declare that X tribe is an Indian tribe that is entitled, is eligible for the special programs and services, da-da-da-da-da. And that would satisfy IZDIA, is that correct? That's correct, Your Honor. Congress certainly has that authority. Sorry, I'm using too many acronyms here. Did the Alaska Native Claims Settlement Act do that in creating the ANCs and giving them the role that it gave them? No, it decidedly did not do that, Your Honor, in what's been rendered very clear since. There was uncertainty after ANCs as to whether the villages had sovereign authority. There was a lot of debate over that. For 15 to 20 years, the solicitors had an opinion. In 1993, the Sancinetti opinion resolves that and says, yes, the villages certainly had governmental authority and the corporations. It's been understood, I think, from the get-go, and that opinion, again, confirms this, that corporations do not have sovereign governmental powers. They do not enjoy a government-to-government relationship with the United States. The ANCs don't even make that claim. Hence, they are not recognized in that way. Well, I'm trying to understand what this eligibility clause is looking for, because as I read it, it sounds like the tribe has to be eligible, I say for, as in to receive the special programs and services provided by the U.S. government. But then you reference, and there have been other arguments, that actually this clause is satisfied if an entity provides the programs that the government would otherwise be providing. Is it that you have to be, is providing by contract or whatever, the services that the government otherwise would be, say, health services or educational services, is that sufficient to satisfy the eligibility clause, or do you have to both, is providing it insufficient, you also have to, you and or your members have to be eligible to receive them if they were administered by the U.S. government? It's a term of art, Jan, it's been used for a long time in federal Indian law, and what it was historically understood to mean was that you had to be eligible to receive benefits and services from the United States, you know, by virtue of your status as Indians. And so then what ISDIA said was, so if you are so eligible by virtue of your status to receive benefits and services, then you can make this designation to say, hey, we actually now want to administer those programs, those services, ourselves, we want to take them over, and we're passing this resolution directing the secretary. And your question goes to a very important point, the ANCs, a lot of the ANC briefing, including some of the amicus briefing, talks about how they provide services in Alaska, and we don't gainsay that the ANCs play important roles in doing that in Alaska. They do provide services in the Maine because tribes, the villages, have designated them as tribal organizations to provide such services. There are some limited exceptions where Congress itself has. They do provide them some, you said in the Maine, and maybe this is where you were going, they do, as I understand it, also provide them in areas where there is no tribal government to, or native Alaska, I'm going to use tribal for the shorthand here, Alaska natives, there is no tribal government or entity to sort of contract with them as an organization provided. Isn't that right? That's right, Your Honor, and that's a situation which has been expressly covered by subsequent separate congressional statutes, the 1997 Act, which covers that situation where you have like Anchorage, which this is why the ANC and U.S. briefing focuses so much on the provision of healthcare in Anchorage, the Anchorage area, because there's a separate congressional statute that authorizes the ANCs to do that. That is an area where exactly as you say, there are not native villages with jurisdiction. This is just like the situation in the lower 48 states where we have a lot  where there aren't tribes with jurisdiction and there are separate congressional authorizations for tribal organizations. Can you give me a cite to that? It's a 1997 statute. Yeah, that's cited I think at our reply brief at page 12. It's the 111 Stat 1543, 1997. It's the statute that's discussed in the Ninth Circuit's Shalala case, 166, Fed Third, 986. There's a lot of discussion about that statute in the briefing, but I think the ultimate point about that statute is that Congress specifically authorized specific ANCs and their subcontractors to provide health services in the Anchorage area. One thing that, you know, a one theme, common theme in the government briefing, the ANC briefing, the amicus briefing on their side is trying to create this picture that if you adhere to the statutory text here, to what Judge Cassis referred to as the grammatical reading, you would be upending 45 years of agency practice. And I really want to stress that that is not the case, that the examples mentioned really fall into- Do you have any evidence that, what is your evidence that when, for example, prior to this 1997 statute, the secretary authorized ANCs to provide services in areas where there was no tribal government, that they were doing it, they were treating the ANCs as a tribal organization rather than an Indian tribe? How do we know? And it's a little tricky because in some ways, you know, on our side we're asserting a negative. Here's what I can say. The district court asked the United States whether it could identify situations where the ANCs were acting as a tribe, where they were the ones authorizing the contracting. The government initially couldn't identify any situations. Ultimately, I think the only situations that the government or the ANCs have pointed to where the ANC is acting, and again, I want to be very clear, as the authorizing tribe, are really a handful of situations. The Anchorage, the pre-statutory Anchorage health care situation, and one or two other health care- May have been for a couple decades, right? I'm sorry? It may have been for a couple decades, right? The practice in Anchorage? I don't recall exactly when it started, Your Honor, but it was very limited. We're talking about one regional corporation and one or two subcontractors with a lot of controversy. The reason why the Shalala case and the statute came about was because there was controversy over whether the villages themselves had to provide the authorizing resolutions. The government's position was? That was mooted by the statute. And what the Ninth Circuit- In that litigation? Right. The Ninth Circuit 7 Shalala case, the statute- That was the U.S. government, Interior's position. It was that the ANCs were authorized to do it, correct? As tribes, not as organizations? Right. Where there were no villages present in that area. As tribes, like the Solar Memo, not as a tribal organization. Right. And here's the important point. So you have the Solar Memorandum in 1976, which says what it says. But then in 1981, and this is glossed over, comes the IHS guidance, which DOI then subscribes to. What IHS says is very clear, that the villages are the primary contracting authority because they are the repository of sovereignty in Alaska. And then they lay out a hierarchy where they say only where there is no functioning village government can the corporation step into the shoes and essentially act as the village government. What's happened since then is all federally recognized native villages in Alaska have functioning governments and have had it for decades now. So that's why, as a matter of practice, to go to your question, the number of situations where you had contracts authorized by a corporation are extremely limited and now are ahistorical because the villages have functioning, robust governments. They act as the contracting authority. So if one is talking about, you know, countertextual premises here, one wants to talk about did Congress ratify some agency practice? There is no uniform countertextual agency practice that is stretched over these 45 years that Congress would have been aware of. All right, Mr. Kanchi, I'm going to interrupt you because you're over your time. And I have one last question, and that is, what concerns me is that Alaska natives, who I understand are not part of any tribe, and they get whatever services, help, assistance that they get from the ANCs. Now, you gave the example of the parishes. Numerically, there would be no parishes that would qualify for CARES Act assistance, but those people are also eligible for state assistance. And my question is, so they wouldn't be left without any assistance. My question is, does the state of Alaska or any other body, if we rule with you, provide the assistance, the emergency assistance that is going to every other Alaska native to these natives that the ANCs provide the services to?  No, they certainly will not be left out in the cold for three reasons, Your Honor. One, yes, the state of Alaska provides services to them. They certainly are Alaska citizens. Secondly, the ANCs, as I've said, in the urban areas have been authorized by separate congressional provision to provide services in these urban areas. And that really is absolutely no different than the situation for Indians in the state of Alaska, where actually over half of Indians in the lower 48 states live in urban areas and are provided for by these separate programs, not by the Indian tribes. And in that regard, it's worth noting that Title VI of the CARES Act, the immediately following title, is directed towards health care provisions and includes a billion dollars in IHS funding, including I think $450 million for IHS funded programs like the ones that the ANCs are carrying out in the urban areas. So there are nobody, of course, wants anyone left out in the cold. And that would not happen to, you know, Alaska natives in the urban areas or Alaska natives in the villages. But it is critically important as a matter of law how the services and programs are provided for and that Congress's determination as to where sovereignty resides in the text is respected. All right. Thank you. We'll give you a couple minutes in reply. Mr. Rasmussen. Thank you, Your Honor. May it please the Court, my name is Jeffrey Rasmussen. I am the attorney for the Ute Tribe and am representing, have the honor to represent seven sovereign tribes in this case. The core point that we want to make is that the CARES Act is the statute that we're dealing with here today. And the CARES Act says recognize governing body of an Indian tribe. Everybody agrees. The United States NDANCs agree. The standard is are they recognized governing bodies of an Indian tribe? They would like to parse that down into Indian tribe, read out recognize, and say they have governing bodies. But the phrase recognize governing body of an Indian tribe has always been understood to mean the recognized tribes in the United States. The United States in its brief in this case, in fact, admits that if this had said, oh, we're going to give this money to the recognized tribes, that would be the 574 tribes. But they come back and say, but when we put in the governing bodies in the middle of that phrase, suddenly that changes it and that makes ANCs eligible. The case law that we discuss shows two things. First, that recognize governing body is a term of art. It is used to identify the recognized tribes. The tribes the United States admits, if we use the phrase recognize tribe, we know what those are. Those are the 574 tribes. Those are not the ANCs. The recognize governing bodies of those tribes are the ones that are to get this money. Then the other part of it is, and we cite in our brief a number of cases. On page two through four of our brief, all of these cases support that ANCs are not recognized governing bodies of tribes. Every single one of them. We also cite the two main treaties on Indian law, which also support our argument. Statutory language here talks about only eligible for special programs and services. Often when the federal government has talked about recognizing an Indian tribe in its sovereign capacity, it talks about not only just recognize as eligible for programs and services, but also for the immunities and privileges available to them as a sovereign. That isn't the language Congress used here. It just focused on eligibility for services. This was post ANSA, Alaska Native Claims Settlement Act. Some of the unique nature of these ANCs there. Is it not important that we're only talking here about services and not that additional, tribes are more than just getting recognized Indian tribes, as you're using that phrase, do much more than just get services and programs. They are conferred privileges and a sovereign status, which is not referenced here. Does that matter? No, that does not matter. The phrasing recognize governing body of an Indian tribe incorporates all those concepts that we have to deal with, whether the tribes are federally recognized for the programs and services. That's what recognize means. Whether they're federally recognized for the programs and services uniquely available to Indians. 20 years later after the List Act, but what evidence do you have that it had that meaning in 1975? Well, first of all, the CARES Act wasn't adopted in 1975. No, it's incorporating a definition from 1975. So we're going, that doesn't, you're not suggesting that the CARES Act changed the definition of that, right? We're not suggesting the CARES Act changed the definition of Indian tribes. It could be one thing in 1975 and a different thing in 2020, right? You're not suggesting that. No, we're not. But the CARES Act uses the phrase, and everybody agrees that the CARES Act uses, says this money goes to the recognized governing bodies of Indian tribes. And recognize, a recognized tribe or a recognized governing body of a tribe is the term of art. That's the problem. I'm not sure, I think the term of art is building on the List Act. I'm talking about what recognized as eligible for services meant in 1975, because that's what Congress wanted to govern the CARES Act distribution. And recognized for those services at that point in time meant basically what we now think of as the recognized tribes, the federally recognized tribes. In 1975. You know that's what it meant in 1975. Right. The phrasing, and I think everybody agrees that that final phrasing, that qualifying clause in that statute is referring to entities that are not ANCs, are not the corporation. Not everybody, unless I'm misunderstanding the ANC's argument is that they meet that clause. They do at one point make that argument. Yes, Your Honor. Everybody agrees. And I'm asking the question because I'm curious about the answer. So I'm not yet agreeing, so you can't say I agree yet. The evidence was in 1975 that it had that meaning. The United States does not agree with the ANCs on that point. And the ANC's argument has been. I know, but you don't agree with other arguments made by the United States. So saying the United States doesn't take that argument doesn't help you very much because you disagree with their position. No, we're saying. Not the United States. 1975, and that's what it meant. That's what would really be helpful to me. What I'm saying is not that the United States doesn't make that argument. The United States disagrees with that argument. The appellees disagree on that point. I'm not, I understand. I actually really understand. I believe everyone's positions here in this case. I'm going to try to question one more time. What is your evidence? Case law, statutory law, Department of Interior pronouncements that in 1975, that phrasing there, eligible for services and programs, nothing more, meant recognized as sovereign government. I don't think we do have that. And I think that's part of what Mr. Conje has pointed out is that in 1975, there was still the possibility that ANCs would qualify under that provision. We now know that they don't. But in 1975, there was that uncertainty. There was that possibility that the inclusion of ANCs would bring in some. We don't all know that. They don't now do it. That's one of the issues in this case. That's why I'm trying to ask you, what can you do to tell me to support, what is the rationale that doesn't jump ahead 20 years to tell me what Congress meant when it put that eligibility clause in there? Had it used that phraseology before in legislation? I do not know if it had used that before in legislation. I think what you're getting at is the point that Mr. Conje was making, that in 1975, we did not know that. We do know it now because there are multiple cases now. All right. So I'm just talking again about 1975. Had Interior used that language before? Did it have a settled meeting at the Department of Interior at that point? Statute of counsel is out of time. Indian law treatise or anything like that? No. Largely recognized tribe comes from the idea of the List Act or the tribes that have been recognized by Congress or that have been recognized by the United States in some other manner as Indian tribes. So there was the concept of recognized tribes at that point in time. But largely, the references now are to the List Act itself. That's where we talk about the recognized tribes. We all at this point would say ANCs are not recognized tribes. I know that, again, I know that the ANCs at one point may just briefly make that assertion. But the case law is just overwhelming that ANCs are not. We'll let the ANCs tell us if they mean it or not. I had assumed they were serious about the argument. But they can answer that question, I think. So what we have, though, are a number of cases, as I was saying, that make this point that ANCs are not the recognized governing bodies of Indian tribes. In its response brief, the United States actually cited one of the cases that we had to leave on the cutting room floor in our brief, our opening brief, the Sac and Fox case, election board case, and the related case, the grassroots, which are Eighth Circuit cases. And in both those, they're talking, the core point is, what is the recognized governing body of an Indian tribe? That is the core of those cases. And there was a dispute about which of two entities was the recognized governing body of an Indian tribe. And the court said, we look to the BIA to tell us that. Who is the recognized governing body of these Indian tribes? And we look to the list that the United States publishes of those recognized governing bodies of Indian tribes. So again, as Indian law practitioners, we know when Congress uses the phrase recognized tribe or recognized governing body of an Indian tribe, as it did in the CARES Act this year, we know what they're referring to. They're referring to those 574 tribes. And so that's, they're referring to these sovereign tribes. And the final point I wanted to make was the general structure of the CARES Act. And we discussed that in our brief, and the other side comes back and says, just ignore it. But Titles I and II are for corporations, as Mr. Kanji noted. Title VI has the money for some types of medical services. Title V is all for sovereigns. Every single other entity there is a sovereign. And that is what, how Congress structured this act, and it used the phrase recognized governing body of the tribe to reference the sovereign tribes, just like all of the other sovereigns that are in Title V. Thank you. All right. Mr. Jed. Good morning, Your Honors, Adam Jed, or excuse me, good afternoon, Your Honors. Adam Jed, on behalf of the United States, may it please the court. The IDEA definition of Indian tribe expressly includes ANCs and uses ANC-specific language. Statutes are not self-defeating. A statute should not be read to include ANCs and then immediately to take them away. And by 20- Does the disability clause apply to Alaska Native villages? Yes, Your Honor, it does. I think since- I'm sorry. I mean, I guess you're put it in, take it out. But can you give me any grammatical transition that explains why Alaska Native villages, as defined in the ANCSA, are subject to the eligibility clause, but the other things in that same list and in the same set of comma set off are not? Sure. So I guess there's kind of a set of grammatical answers to that, and then there's maybe a little bit of a historical answer to that. I mean, grammatically, I think we have two main points here. The one, of course, is just sometimes folks make grammatical errors, and there are obviously other kind of contexts dependent in detail what a statute means. But we actually cite a couple of grammar guides where we point out that this issue of, I think one grammar guide calls it an ex-proposed modifier, is viewed by many as a common grammatical error, but is actually viewed by others as permissible. I think the idea, and this is kind of like the baseball example that we use in our brief or the District of Columbia example that Mr. Clement uses in his brief, is when you have a list of items followed by a modifier. Statutes, by the way. I'm sorry, Desmond, I didn't quite hear you there. Statutes, right? Your hypotheticals were not from statutes. Those are not from statutes. I think the best statutory example we have actually is if you look at the Hayes decision. It's a Supreme Court case from 2009 that we cite in our brief. There you had, it wasn't just a list of individual words. It was a couple of different phrases in a statute. And the Supreme Court there ends up holding that kind of modifier phrase at the end actually skips over something to apply to the earlier phrases in the statute. Do you have anything where it applies to, what you need to show me is that it applies to one thing in the newly added set-off language. And remember Alaska Native Village is not only at the beginning, but it fits the end of that set-off as well as defined in the Alaska Native Claims Settlement Act. So the eligibility clause applies to Alaska Native Villages, the beginning of that set-off clause, and the end of it as defined in the Alaska Native Claims Settlement Act. But then it doesn't. Apparently it pops off again for villages, regional or village corporations as defined in the ANCSA, it's time to establish. Do you have one like that? I certainly don't have an example of a statute that's kind of structured in the identical way to this statute. I guess there are kind of two points I want to make in response to that. The first is that just to push back on the premise a little bit, I think it's mistaken to understand that whole phrase as one newly added phrase. If you look at the drafting history, you first have the addition of the Alaska Native Villages. It makes perfect sense that the recognition clause applies to that. You then end up with the addition of the ANC. I think it's six months later, done by the House. And at that point- Alaska Native Village as defined? I believe the initial language there was, yeah, Alaska Native Village as defined. And then six months later, you have the House adding in the ANCs as established pursuant to. So I think the reason we've ended up with this structure is just that the House was kind of sticking with the initial structure when it made those amendments. And I should actually point out, as we spell out to some extent in our brief, the fact that they didn't just add ANCs, but also added that additional phrase, established pursuant to, means that this wasn't just some kind of misunderstanding about what ANCs are. It's not like they were just kind of throwing the kitchen sink at anything that could possibly exist in Alaska. This reflects an actual understanding of what ANCs are. They're special corporations that are established pursuant to federal law. The federal law does not itself establish them. They're actually set up as Alaska corporations. So I think to the extent that there's- That's a very good argument that Congress meant what it said in that addition. But what evidence do you have from 1975 that Congress knew that they did not meet the eligibility clause? So I think there are a couple of pieces of evidence that I can point you to. The first is that this concept, any kind of recognition has been thrown around as a shorthand for it. Acknowledgement is another shorthand term that's often used for this. This concept is kind of a singular package. The idea is, to use the language of some of the early 1800 Supreme Court cases, that Indian tribes are this kind of domestic dependent nation, that the federal government is recognizing or acknowledging their sovereign status, and that what comes with that is both forming a government-to-government relationship and also having this kind of obligation to provide special services to them. And we cite in our brief several cases going back to the early 1800s that make that point. The Coen's Treatise makes that point. We cite the current Coen's Treatise, but if you actually look at the Confederated Tribes Reply Brief, they cite the 1942 edition of the Coen's Treatise. I think it also is sort of treating this as kind of a singular package. So, you know, look, obviously Indian law is a complicated area, and, you know, I can't kind of get into the minds of every member of Congress who drafted this, but in 1975, any kind of basic understanding of Indian law would have meant that this kind of package, this idea of recognizing something as eligible for these special programs and services. No, I mean, I get that, and I think even more relevantly, Congress itself had used this phrasing in statutes and termination acts like 16 times. So I guess that's what the clause meant. What I was trying to ask, and I guess I wasn't clear, I apologize, is what evidence was there that ANCs didn't need it? Because it seems to me, and I think the Secretary of Interior even recognized in the 1970s that we're kind of a mess here on who sits within this and who is not within it. I think they referred to it as a longstanding and very difficult problem when they were promulgating regulations in 1978 to create their own list, right? The Secretary had lists long before the List Act. And so it was rather a mess. And you even saw, I think in 1988, ANCs were put on that list, and then in 1993, it was all before the List Act, they were yanked back off. And so I'm not sure even the Secretary of Interior knew at the time whether ANCs, given their unique status, were meant to meet that eligibility clause. Do you have something that shows me that Congress was aware when it put this clause in that ANCs would not meet, that ANCs would not meet, not what the eligibility clause meant, but ANCs would not meet it? So I think I can maybe give you a historical answer and then a textual answer. Just historically, I have to push back on the premise that whether ANCs could satisfy this is somehow complex. Again, you look at the 1800s cases, now I'm not just talking about this being a single package, but they're talking about whether something is a domestic dependent nation, something that an ANC just intuitively couldn't satisfy. If you look at the 1942 treatise that Mr. Congy cites for the first time in his refinery, he quotes one element of recognition that was being considered, but if you look at the others, they're talking about a history of treaty relations, a history of political relations, being viewed as a tribe by other tribes. In fact, that treatise specifically says sometimes the difficult questions are what to do with an association of Indians, and there the treatise says what's critical is having political relations. And Judge Millett, in the 1978 preamble that you referred to, the preamble says that historically one of the most important factors has been a political relationship. In fact, we actually cite a study that was conducted in 1977 of what was then Interior's recent recognition criteria, which made clear that they were looking at whether there's a history of a political relationship. So a recently formed for-profit corporation under Alaska state law just couldn't have that kind of history. But Judge Millett, I think there may also just be a textual answer to your question, which is if you just parse the phrase to be eligible for these special programs and services provided to Indians because of their status as Indians, it's hard to understand how these corporations could be eligible because unlike every other listed entity in that list, a corporation isn't a group of people. A corporation isn't an artificial legal entity. And I know the plaintiffs have tried to argue well for at least 20 years their shareholders were going to be Indians. But nonetheless, the corporation itself is an artificial legal entity which presently was owned by Indians, might not always be owned by Indians, whereas everything else like a tribe, although it may have some kind of legal status, is also just a group of Indians who are eligible to receive those kinds of services. I think you would agree as well that Congress itself could decide if someone meets this clause, whether or not they would have historically. It could be this clause, and by the way, this clause does not have language about sort of historic recognition or political status. It's just about eligible for programs and services. And given that they just said we set these things up in the statute, why wouldn't it have been perfectly sensible for an awful lot of the members of Congress who are voting for this, and presumably we're not as experts in Indian law as you all are, that those things that were just established in ANSA, like analogously to the Alaskan Native Villages, are eligible for these programs, but not for the privileges and immunities of sovereign status. So I think maybe there are a couple of questions nested in there if I can kind of take those in order. As for whether Congress might have included ANCs kind of as a hedge in case Congress by statute would later recognize ANCs, I think there are two responses. The first is just although, of course, Congress can pass statutes that recognize tribes, there is still a kind of conception of what recognition counts as, and although I think the plaintiffs have suggested on the margins there's some complexity or maybe some disagreement, the kind of line about exactly what is or could be recognized has never even come close to something like an ANC. But more importantly, Judge Millette, it would be- I know, and the Secretary of Interior included them in 1988 on its list of recognized tribes. That strikes me as pretty strong, and they were there for five years. So it's pretty strong evidence that this is not as crystal clear. It wasn't even to the Secretary of Interior in the 80s and early 90s, let alone to Congress in 1975 when it had just, you know, only four years into ANSA at that point. Well, I need to push back on that premise as well. I think if you look at the language of some of the subsequent Federal Register notices published by the Department of the Interior that we cite, they clarify this, which is when Congress included ANCs on some point on a list, essentially what they were trying to do is they were trying to say, look, there are things that count as Indian tribes for different purposes, and because ANCs are Indian tribes under ISDEA, mind you, a position that obviously the plaintiffs think is incorrect, that we want to make sure everyone knows that these are a set of entities who are eligible to contract with us. And as we point out, this is a definition of Indian tribe that has been incorporated into dozens of other statutes. And Interior then clarifies. I mean, if you look at some of the- I think the preparatory language in the 88 Federal Register notice that you're referring to, certainly the later Federal Register notices when ANCs come on and then go off, they start to make clear, look, we're including them for limited purposes. Then they take them off. They say, we're taking them off because it was essentially causing the very kind of confusion that we're talking about now. But it's not a confusion as to whether ANCs could be recognized. I think Interior has been clear about that all along. And Judge Follett, just to add, it would be particularly strange for Congress to have included ANCs in case Congress later decided to recognize an ANC by statute. I'm just saying maybe Congress thought they'd already done that. I don't even have to say later. And, you know, again, I guess if they think they had already done that, then, I mean, that may just be a reason to agree with Minister Clement's position. But, one, I think that's not how recognition had typically been understood. And, I mean, I just want to point out, lots of congressional statutes are complex or deal with kind of niche areas of the law. And, you know, the general rule against reading a statute as a melody, I don't think is only limited to statutes that are kind of intuitive or obvious or everyone would know what's going on in the statute. I think we generally understand that Congress knows what it's doing when it passes a law. And we kind of read the text based on the actual meaning of the text without evidence that Congress may have known every little kind of jot and diddle and concept. But here, I do think that the plain text, when it says to be eligible for services because of their status as Indians, I think that is a reference to the groups of Indians that precede them rather than to these artificial legal entities that at best in the subsequent years provide services but don't actually receive services. All right. Questions? I don't know if my colleagues have any others. All right. Judge Katsas? I'm fine. Okay. Then we'll hear from Mr. Clement. Good afternoon, Your Honors, and may it please the Court. Paul Clement for the Interveners. Both sides to this dispute insist that the plain text decides the case. But the single clearest feature of the relevant text is Congress's express inclusion of regional and village corporations established pursuant to the Settlement Act in IZDIA's definition of an Indian tribe. Now, as we've heard, the appellants contend that Congress's negated that express inclusion of ANCs through the implications of the eligibility clause, which they read as both modifying ANCs and categorically excluding them from the definition. But I think there are two – Both sides are claiming text. But isn't the most fair way of thinking about this case is that there are competing canons of interpretation. You have a very powerful one that we don't likely presume substantial inexplicable surplusage. And your friends on the other side have a pretty powerful one that we don't likely presume completely bizarre grammatical constructions where, you know, one clause modifies everything at the beginning and everything at the end, but not one or two things in the middle of a list. So which of those prevails and why? So two points, Judge Katzus. First, we offer at least one construction of the statute. We offer you two ways of reading the eligibility clause. And one way to read the eligibility clause completely avoids the grammatical problem. If you read the eligibility clause in its ordinary meaning, not as a term of art reference to recognitions as sovereign, but if you read it instead, and I think this idea was embedded in some of Judge Millett's questions, if you read it instead as simply a recognition for eligibility for special programs made available only to Native Americans, if that's the way you read it, which I think is its ordinary meaning, then you don't have to choose. There's no grammatical problem. You can read the ordinary meaning of the eligibility clause to modify ANCs, and ANCs readily satisfy it because they are eligible for special programs. They've been recognized as such from the federal government going all the way back to the Settlement Act itself in 1971. They haven't been recognized as sovereigns, but I don't see the word sovereign in that eligibility clause. I think, as Judge Millett may have alluded to, if you really want to go back and parse the statute that was issued in the Ninth Circuit Frank's Landing case, you see at least one clear example where Congress used an eligibility clause that looks exactly like Izdiyaz to talk about eligibility for special programs in the context of a tribe that expressly did not want to make a federally recognized tribe for sovereign purposes. So I have my second answer to you, but I do want to make clear that the virtue of our argument that read the eligibility clause in its ordinary meaning, ANCs satisfy it, the virtue of that is there's no grammatical problem at all. Can I just interrupt you and say, let me just interrupt and say, but doesn't that interpretation make the eligibility clause almost surplusage? I mean, what does it add then? What it adds then, Judge Henderson, is the exclusion of state-recognized tribes that are not federally recognized for any purpose. And I think with respect to a state-recognized tribe or something other than the corporations that were expressly created by a 1971 Act of Congress, the eligibility clause has work to do. And that's really a good segue to my second part of the answer to Judge Henderson, which is, so, if you assume for a second that the eligibility clause doesn't have its ordinary meaning, but has a term of art meaning that's limited to sovereignty, then I think the way to read the clause is, sure, you start with the, you know, the serious distribution canons. I don't think anybody thinks it modifies only the last antecedent, but you only have it modified those terms that it usefully or meaningfully modifies. And if you get it to a point where it wouldn't just modify the term in a way that would allow you to get a subset of those nouns, but would completely oust the noun from the statute, even though Congress expressly included it, I don't think it violates any rule of grammar to say that, you know, the serious modifier canon, which is itself, as Justice Scalia said, in his treatise, one of the weakest, most contextually sort of influenced canons. If that gets you to a point where you're going to oust a phrase that Congress expressly put into the statute, then I think that clause yields. So the long answer to your question is, if you have an application of the serious modifier canon that allows the modifier to meaningfully modify other nouns, but it gets to particular nouns and would oust them from the statute, you're creating a huge surplus fluidity problem. Then the surplus fluidity canon or the anti-surplus fluidity canon carries the day. And I think that basic statutory principle is profoundly buttressed by the legislative history. Not everybody looks at it, I realize, but the drafting history is very powerful here because it's been, has been alluded to the eligibility clause within the statute, modifying all the other nouns, including Alaska native villages at the point that Congress added the ANCs to the statute. And one other piece of contextual evidence. And again, not everybody likes to look at house reports, but there is a house report that buttresses that accompanies the addition of that language. The government cites it on page 31 of his brief. And what the house thought it was doing, and it states it very matter of factly, is adding ANCs to the definition of an Indian tribe. It didn't say it was adding them to the definition on the off chance that at some future point in time, some subset of ANCs might satisfy the eligibility clause. Congress thought it was definitively adding the ANCs to the definition of an Indian tribe. So I think that's, you know, there's a number of questions asking what was Congress thinking in 1975? I think that's, for those that look at it, pretty good evidence. The other thing I think Congress was fully cognizant of. The problem. The problem there is that Congress had to use this phrasing 16 times, at least 16 times before all of which were termination acts, which meant it was not just cutting off services, but was definitely cutting off the political dependent status relationship with the tribe. And so when Congress then picks that same language up and plunks it down here, it must, I think we should presume it had the same meaning. The only question is whether maybe Congress wasn't clear yet whether ANCs would have that status in light of the Alaska Native Claims Settlement Act or not. Not what that language meant, but what the ANC status would be if someone were to apply that language to them. So Judge Millett, I'd like to beg to differ. And I really think, you know, there are two kinds of federal statutes that address Indian tribes in some loose sense. And some of them that are about providing programs and services to Native Americans. And some of them are about more sovereign matters. And I don't think you can just mish and mash those together. I mean, the Alaska Federation of Native Amicus Brief, I think it's helpful in just sort of broadly kind of looking at those two baskets of statutes. And so even if this... Post-1975. At the time Congress put this in as DEA, none of those other statutes, unless I'm wrong, please tell me, in my research none of them existed. The only time this phraseology was used was for termination acts. And I think that's what I'm trying, you know, I feel like I need to look at that and not look at the sort of, as you will say, mishmash of statutes that shows up afterwards. Sometimes they put them in and sometimes they list them separately and sometimes they say they're out. So two responses, Judge Millett. See every one of the termination acts by definition is all about sovereignty. It's also about services. I mean, and it uses the services language. It doesn't use the sovereignty language. Yeah, but the whole point of the statute is, you know, if it's a termination statute, it's terminated sovereignty. I know, but it's also terminating its obligation to provide services and programs to this dependent nation. It's terminated both. Sure. And I mean, you know, and I suppose if you're going to terminate sovereignty, you terminate an obligation. I'll grant you that. But when you come and you have a statute that's about something else, which is not about sovereignty at all. And you see that reference. That begs the question of whether that clause is about sovereignty or not. And so you'd think, you'd think if they were meant to use something that didn't involve, include the political relationship, they would use different phraseology. Here's the other part of my answer, Judge Millett, is that the big thing, I think with all due respect, your question misses, is the big event is happens in 1971. Congress creates these new novel hybrid organizations that they know are going to play a very important role in delivering programs and services to Alaskan natives. Right. Delivering, but not receiving. I mean, that's why, that's why, I can imagine why Congress was confused here, but as I read that language is talking about tribes being eligible for services to Alaskan natives, not just that they are eligible to sign a contract to deliver these services to Indians. But with respect under ASEA, and this is very important under ASEA, there really isn't any question that the ANCs are the tribe that receives the fund. They are the tribe that is. This will be very helpful to me. Is there something you can point me to, that says the ANC received, not just to administer it to someone else, but received for itself and its members, which I guess would be shareholders, programs or services from the U.S. government. Does it get healthcare services? Does it get educational services? Does it get any kind of services from the U.S. government? What it gets is it, not somebody else designating it as a tribal organization, but the ANC as the tribe enters either a compact or a contract with the United States government to provide the services to Native Americans, not to themselves, but to the Native Americans. They and their members don't receive them, their shareholders, whatever you want to call them. They don't actually receive these services from the U.S. government. They receive the money and then they provide the services. These are the differences between being a contractor for the government to provide services to someone else and being someone who's eligible to receive, to do both, both receive those services. And you know what? Let's cut out the middle person. We will deliver it to our people. With all due respect, I mean, the statute doesn't say, which is recognized as eligible to receive. Well, I get that, but it says for the programs and services provided by. Right. And I view that as eligible to participate in that. I mean, you know, everybody's got to add a little bit of language. I guess if I'm a subcontractor providing vaccines to some local community, that doesn't mean that I'm eligible for that vaccine myself. It just means I've been hired as an arm of the federal government to give this vaccine to other people here. Those other people are people who have the status of Indians. But that doesn't mean I'm eligible to receive it myself. You had a vaccine that was only for healthcare workers and then they hired non-healthcare workers, but really good shot givers to administer it to help to provide this program or service to healthcare workers. That would not mean that the contractor is itself eligible to get that first vaccine. It's just administering it to other people. That's how I understand ANCs, but maybe I'm wrong. So I don't read the statute that way. And I don't think the ANCs are any different from the tribes in this respect. And I think it's helpful if you read the statute. I think even under my friends on the other side's position, the which is recognized clause is modifying, not the recipients, it's recognizing any Indian tribe, band, nation, or other group or community, including the village or the village corporation or the region corporation. All of the relevant programs, all of the relevant special programs and benefits, especially if you understand the context of IZEA, which is they're essentially kind of moving from the federal government providing all the benefits to the native Americans directly. And they're trying to involve the tribal entities as a middle person. So I think if you understand that context, it's clear that they're not talking about not just ANCs, but the tribe or any of these other groups being the ultimate recipient of the shot in the arm of the vaccine. They're saying in the context where previously the federal government would do the vaccinations themselves through the Indian health service, which always has an antecedent, right? Which has to refer backwards, not forwards to Indians. It has to refer backwards to Indian tribe, band, nation, organized group, community. So that's the thing that has to be eligible. Exactly. But since those are all entities, those are all groups, then I think you read the whole phrase, which is recognized as eligible. I think you do essentially say recognized as eligible as middle people, because that's the role under these programs, all of the entities perform. And then you keep reading and it says for the special programs and services provided by the United States to Indians because of their status as Indians. So the rest of the clause is talking about the recipients and the nature of the programs. But of course we fit those to a T. This is ambiguous. This eligibility clause, not the prior clause, but the eligibility clause. Don't we have to give Chevron deference to the interior on that, which says you don't need it? No, I don't think so. I don't think they've asked for Chevron deference at all. They haven't asked for it on the, whether that clause applies to ANCs. You don't think that they would claim Chevron deference to what the eligibility clause means? I don't think so. I mean, I think they, you know, they've been quite candid. I think in asking for Skidmore deference and nothing more, it's not my experience that the government is shy about asking for Chevron deference when they think they're entitled to it. They've asked for Skidmore deference on whether the eligibility clause applies to ANCs. I mean, they can, I guess, tell us later in a letter if they want whether they claim Chevron deference for what the eligibility clause means, which is a separate legal question. Sure. But they haven't claimed it at this late date. It seems a little late, Your Honor, with all due respect. And I don't think, I think just it helps to take a step back because we know from the house report, we know from the drafting history, that Congress thought that it was including ANCs in the statute. And it seems to me there's two paths to that result. They either thought that because they simply read the eligibility clause as plain English and said, yeah, the ANC satisfied. We know that. We just created them and we just created them under the Indian commerce clause. And we gave them all sorts of land and all sorts of money that were available only to Native American entities. So if you read it and it's plain language, it seems like the most obvious thing in the world that Congress thought, yeah, of course the ANCs, which we just added are not excluded by the eligibility clause. Conversely, you can read it in this term of art way that says, yeah, that's sovereignty. It doesn't say the word sovereign. It certainly doesn't cross-reference the List Act, which is an act for 20 years. But if you want to read it that way, okay. Nobody in 1975 thought the ANCs were sovereign. They might've thought, there might've been like a jump ball question is exactly how much money the ANCs were going to ultimately get when things played out and Interior had all the Ts crossed and all the Is died. But nobody in 1975 thought that if the eligibility clause meant sovereignty, that the ANCs were sovereign. Why is that so obvious? You make a very nice thematic point that the Claims Settlement Act and the arrangements in Alaska are sui generis. And ANCs are this new kind of entity that's set up in part to perform government-like services that in the lower 48 would be performed by tribes, right? So it's like the tribal equivalent of HHS. And recognition seems to have been much less clear at the time than it is now. So why isn't the solution to, why isn't the solution to my problem of, you know, which, which can and do I offend is to say everything hangs together because even though it turns out ANCs weren't recognized as sovereign, that was an open question at the time. So your honor, first of all, to be clear, if you're going to look at all of the legislative history, you have to confront the fact. I'm not looking at legislative history. Okay. But, but let's say, let's say some of your colleagues are, then they're going to have to confront the reality that Congress was not adding those ANCs that may later be determined to be sovereign. And if they're not determined to be sovereign, we don't care. They thought they were adding the ANCs. The second point your honor is in 1971, the Congress that had a lot of the same members as 1975, not that that's outcome determinative, but they just created these special entities as federally dictated state chartered corporations. Now I don't think anybody is going to tell you that a, a, a state corporation, but the voting patterns of which are dictated by federal law is sovereign. Yeah. I just, I mean, Who knows, right? I mean, there's a whole line of jurisprudence on whether Amtrak is sovereign or not structured as a corporation. But here's the other thing Judge Katsas, which I think buttresses my point, is that they knew they were creating these new corporations as something novel that were in addition to the Alaskan native villages. And they understood that those were sovereign. And so they create a new novel thing that they understand is going to overlap with them and our corporate entities. I just think it really beggars belief that they really thought those were sovereign. And here's the other thing, Judge Katsas, if you're going to give any sort of kind of meaningful sort of consistent interpretation to these statutes, you do have to realize that over time, Congress keeps on using the Izdia definition long after all of this is settled, long after nobody thinks the ANCs can be truly sovereign. It keeps on using the definition in ways where it makes textually clear that it thinks it's including the ANCs. Now it wouldn't be surprising that they thought that because that's the Ninth Circuit's position, which is the circuit where all of these tribes are located. But in addition, you really see this like we cite this 2018 statute, the biomass demonstration amendment. It may not be the most important statute in this whole sort of corpus of statutes, but it's crystal clear. Congress wants to provide these demonstration projects to federally recognized tribes and ANCs. And it does it using the Izdia definition. So it seems to me that's confirmatory of the idea that Congress, going all the way back to 1975, but consistently in statute after statute up to and including the CARES Act, understands the ANCs are novel. They are an important part of the solution of getting funds to individuals in Alaska, but they are not sovereign. I know over my time, if I could say, one thing about the 1997 act, because my friend brought it up and I, and I do think it's important not to misunderstand that act. The 1997 act is doing something that is important, actually confirms our position, but does not support the appellants. What happens is if you look at Izdia in the definition of tribal organization, there is a proviso, the last part of that definition. The proviso makes a lot of sense. The proviso says that if a tribe or a tribal organization is providing services for members of multiple tribes, it has to get the assent of those, all of those tribal entities. So what happened right before 1997 wasn't just like a continuous pattern of things that had always happened, that Syria had participated in Izdia before 1997, but a few years before 1997 an existing Alaskan health service that had been run by the federal government directly in Anchorage and was serving all sorts of natives from all sorts of different tribes was handed over to Syria to run. And the question that arose was, wow, there's like Native Americans from like 200 different villages and regional corporations that are served by this entity. Does Syria really have to get the approval of 200 different tribes and ANCs? And that was what the litigation in that 1997 case was about. Congress passed a statute that said essentially for this facility, like facility specific legislation, you don't need to get the approval of all of the villages and regional corporations and village corporations. And the important part about that is Congress itself waived the requirement to get the approval of the ANCs themselves. And you only need their approval under the statute if they are tribes. So the 1997 statute is a pretty limited focus. It doesn't sort of change the whole world, but everything about it supports the position that ANCs are eligible to participate in ISDEA and are covered by the definition. Can I ask one quick question? Were ANCs, regional or local, eligible to apply for relief under the CARES Act, under the PPP provisions as businesses, business concerns? Some of them. So some of them may have been, Your Honor, I don't think there's anything that expressly excludes them, but the same thing is true of lower 48 tribal corporations. So there's some provisions that an entity with a tribal affiliation, whether it's some organization. My assumption is that lower 48 tribal corporations cannot seek funds as a tribal government. No one thinks they can do that. No, no, but. Whether the folks that are seeking money here could also, and it's sort of different uses of money. I'm just asking whether any could have, or if you're aware, any of your clients have sought PPP funds. So if I'm understanding, we're talking about PPE funds that are outside of Title V. Is that right? I don't know if I got my titles right. Just the ones that are available to nonprofits or business concerns. Yes. It is my understanding, Judge Millett, but I can try to confirm this and send you a letter, is that both some ANC sub-entities and some tribal corporations have sought those funds. Some ANCs have. And some lower 48 tribal corporations. Because they were totally different. They're very different. I'm sorry, with all due respect, I don't think they are any different. Well, maybe not PPP, but they can't. The question here is whether someone could be both a business concern for PPP purposes and a tribal government for these purposes. And maybe you can do both because these things are kind of a unique status. Yeah. And as I'm sitting here, I don't know if the entity that applied for the PPE funds was ANC itself or a sub-organization. But the point is, nobody's questioned, as far as I know, the eligibility of a tribal-related corporation to seek some PPE funds as a corporation, whether lower 48 or an Alaskan-affiliated thing. If I could just maybe finish on this point, though. The one thing that I think is crystal clear is, you know, Mr. Kanji may be right. My friend may be right that like you don't know exactly how the funds are going to be allocated here if we lose. But I do think in the AFN brief, I think there's a nice job of making this point. Given the reality on the ground, given the reality that lots and lots of people in Anchorage, for example, who are Native Americans, are getting their medical services through CIRI, that lots of individuals in other regions are getting their housing assistance through regional corporations, through NAHASDA. If you exclude the ANCs from this statute, Alaskan Natives will be systematically undercounted in the allocation of funds. Even if they are members of a Native village? Are you talking about people not in Native villages? Yes. Because the allocation funds that Interior and Treasury have used, they're a little complicated. Part of them is population, but one big important part of them is employees. And so the lower 48 tribes can count all of their employees in the tribal headquarters, and I believe they can count even the ones in the casino. Those all count as their employees. Now the Alaskan Native villages, because they rely on the regional ANCs and the village ANCs for the delivery of a lot of services, and not because they're lazy or they're weird, but because that's the way Congress set it up in Alaska in 1971, they have very few employees. Their budgets are much smaller than an analogous lower 48 tribe. And that's because a bunch of the employees that are discharging the kind of roles that lower 48 tribes discharge in Alaska are situated in the ANCs. A lot of the budget for some of that is situated in the ANCs. So if you say they're not included in the statute, you will systematically undercount Alaska, underfund Alaska, which presumably explains why the delegation is here, why the Alaskan Federation of Natives that represents everybody in Alaska, including the tribe. The ANCs also, aren't they also providing services to individuals who are not members of Alaska Native villages? There may be a few, but not in any way that's different from the lower 48 tribes. Your brief said that ANCs step in when there is no. Oh, I'm sorry. I misunderstood. I misunderstood your question. So there is a big chunk of what regional ANCs do that provides benefits to Native Americans who are not the member of any village. And that I think is particularly true. You know, it may not be true sort of very much of every regional corporation, but as a population matter, I think it is, it is, it is very true because a disproportionate number of services are provided by Siri to individuals in the Anchorage area, because that's where the population is and a disproportionate number of the people who don't have a village tribal affiliation. So there really is, you know, from, from a population standpoint. They're not members of a recognized Native village. They're not members of a Native village. They may be shareholders of either Siri or one of the other regional corporations. They may even, and this is where it gets a little complicated, but this is where it is the same as the lower 48. You do have the possibility that some of Siri's organizations are providing services to a member of the Cherokee tribe who happens to be up in Anchorage, but that also happens in the lower 48 too. So I don't think anything turns on that, but in terms of a unique undercounting problem, there is a unique undercounting problem in Alaska, not just because of the not counting the budgets and the employees, but because of what you put your finger on, which is there's a disproportionate number of Native Americans, particularly in the Anchorage area. They're not a member of a federally recognized tribe. All right. Thank you, Mr. Clement. Mr. Kanji, why don't you take two minutes? Thank you. Thank you, Judge Henderson. I'd like to make four points if I can. The first has to do with text and surpluses. Judge Katz has this question. This court has answered that question several times. Then Judge Roberts' opinion in the Amico case more recently in Mercy Hospital versus Azar that where you have a natural reading, a grammatical reading of the statute, the rule against surplusage cannot trump that, that it only applies where readings are unclear. Perhaps more significantly, as you said, Judge Katz, there is no surplusage here. The fact under the AMC position, you could never have a named statutory entity and a condition attached to that entity because if the condition isn't satisfied, you would have surplusage. And that is simply not how surplusage is understood. Mr. Clement mentioned, you know, many statutes since this year that name AMCs, those statutes actually prove our point because many of those statutes clearly do not apply to AMCs. They only apply to sovereign governments. I'll give a couple of examples, law enforcement statutes like the Missing Americans Alert Act 25 U.S.C. 1262.3. That has no application to AMCs, but they are specified in there. That would not fit Mr. Clement's approach to statutory interpretation. The Trust Fund Management Reform Act, an incredibly important act from 1994, citing the Surrey Amicus Brief, they admit that it doesn't apply to AMCs, yet the AMCs are there specified. By contrast, Congress has many times since then when it has expressly wanted to include AMCs, has mentioned them after the eligibility clause or has mentioned them without an eligibility clause at all. We cite several examples in our reply brief. Congress knows how to, how to do this. The legislative history does not help on this surplusage argument at all. All Congress did was bring AMCs to the same baseline, put them on the same footing as all the other listed entities in the statute, which are subject to the eligibility clause. We can't psychoanalyze Congress. There may be disputes as to what it was in its mind, but there is no dispute as to the text. Congress placed the AMCs before the eligibility clause. And as I said earlier, it would be passing strange for the one entity that Congress had textually stated could be non-native within 20 years for Congress not to apply the dynamic principle of the eligibility clause to those, to those entities. The questions about the historic understanding I think are exactly on point. First, Judge Millett, your questions, yes, the eligibility language is the mirror of what was used in the termination statutes. It was clearly understood to apply to tribal status. The term that the AMCs ignore is the term at the end of it because of one status as Indians, one was eligible for programs and services. That was understood to mean that if you had tribal status, the trust responsibility attached, you were eligible for the whole panoply of programs and services that the tribe had to recognize governments. The interior department actually suggested the inclusion of that language in his deal that there had been a more colloquial language that sort of approximated what the AMCs are talking about, but interior expressly referencing the termination statute said, no, we should use this formulation and had a well-understood meaning. And Judge Katsas is exactly right. At that time, it is a historical for the United States to look back with hindsight and say there was no chance in 1975 that the AMCs were not going to be recognized in that way. It was a period of tremendous flux. All one has to do is read a Solicitor General's opinion. It does a very good job of conveying that state of flux. Congress itself, the joint conference report we cite from 1971 said, we're creating these institutions. We honestly have a lot of disagreements and understandings about what the exact  meaning is, but we'll, we'll decide later. So it's a historical to say that in 1975, everyone understood from the get-go that the AMCs were ineligible for recognition that would have brought them within the eligibility clause. The AMCs themselves in 1977, and we have to assume they did this in good faith were telling the interior department when it was considering its acknowledgement regulations, we should qualify. Don't close the door to us. It was in 1978 that interior closed the door to tribal acknowledgement to its regulatory process. Though, as you said, Judge Millett, that clearly did not shut the door on Congress's ability as it did with the Frank's Landing community to deem the AMCs eligible under the, under the eligibility clause. Finally. No, that's it. That's it. Okay. Let me give two minutes to Mr. Rasmussen. Thank you, Your Honor. The one point that Mr. Kondew was just making about tribes and sovereignty and what recognition means is important. Again, recognize tribes mean something recognized members of tribes mean something. And as he discusses, we go back and what we're initially starting with is this idea that they have this trust responsibility to these specific native American people and these Native Americans that have entered into treaties with the United States. The tribes entered into the treaty. The membership of the tribe has, the United States has a trust responsibility to the members of those tribes. And obviously we all respect Mr. Clement, but where he really makes a huge mistake here is to assert that we should interpret the statute based upon race and Indian definition is not based upon race. It is based upon. It is based upon race. And I don't think you're hearing that at all, honestly, but what I'd like to ask you is what do we do? What is your answer to the underfunding argument? And the fact that the end of the day, you know, it's just a distinct status. Congress did something novel and very different in ANSA, but it's still meant to ensure services to Alaska natives on the same terms as American Indians in the lower 48. And it sounds like, you know, with the definition you're proposing, what you're doing to the tribal government, their ineligibility here would result in a big difference in coverage. Well, no, we disagree with that. What we've got is that the treasury department developed criteria for how it would allocate money, but for every tribe, and there's over 200 tribes in Alaska, every tribe, every member who is a member of that tribe gets, there was an allocation for that member. Every single one of them. Lower allocation because there's fewer employees. If I understand the system and maybe I don't. There was an allocation made to employees as related to employees as well. But again, that's the allocation standards that the United States chose. And if it had chose a different allocation standard, then Mr. Clement's problem would go away. If they'd solely done it based upon population, for example, there wouldn't be this. That's the allocation issue that the United States has correctly asserted is solely within their discretion. It's not. And so they, in their view of the statute, it doesn't leave, it doesn't create the undercounting problem that your view of the statute does. And they may not, you know, undercounting the CARES Act, but probably in a lot of other programs where there's references to where they adopt the ISDEA definition. Right. And we have concerns about that, but we also, Mr. Clement's argument is would dramatically over count because it would bring all of those large multinational corporation employees within that count. So, yeah, there's not, this is where the United States developed these criteria, but there's a, it would be a much more important overcount problem. A lot of ANSI employees are not Alaska Natives at all? As we use the term Alaska Natives for Indian law, no, they're not because we're using the term to mean people who are, have the political relationship with the United States. If they have that political relationship, then their regional or their tribe, got money for them because they have that political relationship with the United States. And that's where we can't give money. The United States can't give money based upon the racial category. It can only do it based upon the political relationship. So if those people who might not be in mold went and got in mold, they would then be counted, but many of them are not enrolled. And we have the same thing in the lower 48 where there are many Indians who are mostly Indian blood who are not enrolled in a tribe. And that's not different than it is in Alaska. And so there is an undercount in that way as well for all of the tribes. So the allocation formula though, is what the United States came up with and that's not something that we can discuss really on appeal because that is something they had the discretion on and creates an unappealable issue. All right. Judge Katsas, any questions? None. All right. Then counsel, the case is submitted. Thank you, Your Honors.
judges: Henderson, Millett, Katsas